CARPENTER v. CITY OF NEW YORK et al.

(Supreme Court, Appellate Division, First Department. November 23, 1906.)

MUNICIPAL CORPORATIONS—TORTS—USE OF STREET.

Under Rapid Transit Act, § 34 (Laws 1891, p. 18, c. 4, as amended by Laws 1896, p. 719, c. 729), authorizing the board of rapid transit commissioners to enter into a contract for the construction of a road in cities of over 1,000,000 inhabitants, a city is not liable for injuries from an explosion of dynamite kept in a street in pursuance of such a contract, since the city is deprived of control of the street during the progress of the work.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 36, Municipal Corporations, § 1580.]

Patterson and Houghton, JJ., dissenting.

Appeal from Trial Term, New York County.

Action by Robert B. Carpenter against the city of New York and others. From a judgment against the defendant city, and from an order denying a new trial, the city appeals. Reversed, and new trial ordered.

Argued before PATTERSON, INGRAHAM, LAUGHLIN, HOUGHTON, and SCOTT, JJ.

Terence Farley, for appellant.

Benjamin N. Cardozo, for respondent.

INGRAHAM, J. The plaintiff was seated in the restaurant of the Murray Hill Hotel, on the corner of Forty-First street and Park avenue, on the 27th day of January, 1902, when there was an explosion of dynamite in Park avenue, in front of the hotel, which caused him serious injuries, and to recover for the damages thus sustained he commenced this action against the city of New York, John B. McDonald, who was the general contractor for the construction of the subway for a railroad in the city of New York, and Ira A. Shaler, who was the subcontractor for the work through Park avenue. After the commencement of the action, and before the trial, Shaler died, and at the

end of the evidence the court dismissed the complaint against Mc-
Donald, submitting the question as to the liability of the city to the
jury, who found a verdict for the plaintiff, and from the judgment
entered thereon the city appeals.

The complaint sets up two causes of action—the first based upon the
alleged negligence of the city in permitting the storage of dynamite
in one of the public streets, and the second in maintaining a public
nuisance. The plaintiff proved that there was executed on the 21st
day of February, 1900, between "the city of New York (hereinafter
called the 'City'), acting by the board of rapid transit railroad com-
missioners for the city of New York (hereinafter called the 'Board'),
party of the first part, and John B. McDonald, of the city of New
York (hereinafter called the 'Contractor'), party of the second part,"
a contract for the construction of a rapid transit railroad in the city
of New York, under the authority of chapter 4, p. 3, of the Laws of
1891. By this contract the contractor agreed to fully construct and
equip the rapid transit railroad in the city of New York upon the
routes and general plans therein mentioned; that the contract was
made pursuant to the rapid transit statute which was to be deemed a
part thereof; that the contractor should in strict conformity with the
specifications and provisions of the contract, furnish all the materials
and labor necessary and proper for the purpose, and in a good substan-
tial workmanlike manner construct the railroad, for which the city
was to pay a sum of money fixed in the contract. The board reserved
to itself the right to inspect the work which was to be done, and the
materials were to be furnished subject to the direction and approval of
the engineer of the board. The contractor was to obey and follow
every direction to be given by the engineer and in all respects to carry
out his requirements; that the contractor would, during the perform-
ance of the work, safely maintain the traffic on all the streets, avenues,
highways, and parks or other public places in connection with the
work, and take all necessary precautions to place proper guards for
the prevention of accidents, and to put up and keep at night suitable
and sufficient lights, and indemnify and save harmless the city against
and from all damages or costs to which it may be put by reason of the
injury to the person or property of another or others, resulting from
negligence or carelessness in the performance of the work, or from
guarding the same, or from any improper materials used in its con-
struction, or by or on account of any act or omission of the contractor
or the agent thereof. The specifications, which are made a part of
the contract, provide that:

"Whenever rock is encountered in any trench, and blasting is necessary for
its removal, all necessary precautions must be exercised by the contractor.
* * * Explosives shall be used only of such character and strength as may
be permitted by the board."

On September 4, 1900, McDonald made a subcontract with Ira A.
Shaler for subsection No. 4, which extended from the center of Thirty-
Third street to the center of Forty-First street, on Fourth and Park
avenue. By this contract Shaler undertook to construct the road be-
tween Thirty-Third and Forty-First streets, and it contains the same

covenants in relation to the public streets under which this road was constructed as were contained in the original contract between the contractor and the board. In the performance of his contract Shaler constructed a powder magazine in Park avenue, between Fortieth and Forty-First streets, on the west side of Park avenue, about 15 feet from the sidewalk. It was made of wood, about 4 feet high. Annexed to this magazine was a small shanty, which was connected with the magazine by a door and was constructed about a year before the 27th of January, 1902, the date of the explosion. This magazine and shanty were built by Shaler without any permit from or the consent of the city of New York, or any of its officers or employés. The magazine was used for the storage of dynamite for use in the excavation of this tunnel. On the morning of the 27th day of January, 1902, a truckman connected with a chemical company delivered at Forty-First street and Park avenue eight boxes, of 50 pounds each, of dynamite. When he delivered these boxes at this magazine there were then three or four boxes in the magazine unused, which had been delivered at the magazine the day before by order of the contractor. From one to ten boxes of dynamite were delivered each day at this magazine. Some days there would be delivered three, four, or five boxes, and some days more, up to ten or twelve boxes, according to the order of the contractor. The average was from four to eight boxes a day, and these deliveries were made between 10 and 11 o'clock in the morning. The watchman who had charge of the magazine testified that on the morning of January 27th, at a quarter to 12, he left the shanty and went to Lexington avenue for a plate of soup; that after getting the soup he returned and saw a blaze inside the shanty which was annexed to the magazine; that when he saw that blaze he tried to get out of the way as soon as he could; that there followed an explosion; that when he left the shanty there was a lighted candle burning in it. There was a fence around the shanty and magazine 10 or 12 feet high, so that it was separated from the rest of the street.

There was introduced in evidence, over the objection and exception of the defendant, certain rules and regulations of the fire commissioner in relation to the manufacture, transportation, sale, storage, and use of explosives within the corporate limits of the city of New York, under the provisions of sections 763 and 764 of the charter of the city of New York (chapter 378, p. 265, of the Laws of 1897). These regulations provide that:

"All contractors and others now engaged in or proposing hereafter to engage in any blasting operations shall make application for a permit to keep and use explosives, to the inspector of combustibles, in writing, giving name, location of office or place of business, occupation, the proposed location of the magazine or hand magazine, a plan or drawing and description of the construction of such magazines."

Upon compliance by the applicant with all the provisions of the law and of these regulations, the inspector of combustibles would, upon the payment of a fee, issue a permit to such applicant in the name of the fire commissioner, which permit shall remain in force, unless revoked, for one year. Provision was then made for the construction of maga-

zines, which are not to be used for keeping explosives except under certain restrictions; that if the magazine be not less than 50 yards from the nearest protected structure of the first class, and 100 yards from the nearest protected structure of the second class, the quantity of blasting powder which may be kept therein shall not exceed 500 pounds, or in lieu of each pound of blasting powder less than this maximum quantity one-half pound of any high explosive may be kept therein. The regulations further provided for the inspection by the officers of the fire department, who, upon discovering any violation of the regulation, shall serve upon the owner or possessor of the explosive so found a notice requiring the violation to be removed, with due regard to the public safety, within a reasonable time, to be definitely stated in the notice. These inspectors were required to make daily reports in writing to the inspector of combustibles.

Upon this evidence the plaintiff rested, and the defendant moved to dismiss the complaint, which motion was denied, and the defendant excepted. The defendant offered no evidence, and the court submitted the case to the jury. After stating the claims of the defendant and the plaintiff, the court told the jury that the first question for them to consider was whether this magazine and its contents, as maintained on the day of the accident, was a nuisance at this place. They were then instructed that, if they found that it was a nuisance maintained at the time, to find a verdict against the city they must find that:

"The city of New York and its officials knew of the maintenance of an unlawful and excessive amount of explosives at this point, or that that condition had existed for such a length of time that, in the exercise of reasonable diligence on the part of the officials of New York charged with caring for its street property and looking out for the safety of its streets, they had had an opportunity of ascertaining this condition and remedying it, and, in the exercise of reasonable diligence, a reasonable time so to do."

Also that:

"If you find that this magazine, as maintained at the time of this accident, was a nuisance at that place, and that it had continued for such a length of time to be a nuisance that the city authorities charged with the care of its streets and its street property should, in the exercise of reasonable diligence, have ascertained its being a nuisance and abated it, and that they did not do so, then you may find in this action a verdict for the plaintiff for such reasonable damages as you may find that he has sustained by reason of the injury received to himself."

The court then charged, at the request of the defendant, that the city of New York was not liable for the negligent acts or omissions of the inspectors of combustibles; that:

"To establish constructive knowledge on the part of the city, the plaintiff is bound to show that a dangerous, unlawful quantity of dynamite had been kept continuously at the place of the explosion for such a length of time previous to its occurrence that the city officers, using reasonable diligence, might have ascertained the fact."

And, at the request of the plaintiff, that:

"There is evidence that the regulations of the fire commissioner forbade the storage of more than 60 pounds of blasting powder or 30 pounds of high explosive dynamite in any hand magazine not less than 18 yards from a pro-

tected structure of the first class, which would include the Murray Hill Hotel; and the storage of dynamite in violation thereof, if such violation occurred, was unlawful."

To that the defendant excepted, and the jury then found a verdict for the plaintiff.

The fact that there was no license granted by the city of New York to erect or maintain this magazine, or to keep explosives in it, or that the city as a municipal corporation made no contract for doing this work, or had no power to inspect or regulate the work, eliminates any liability on the part of the city for the method adopted for doing the work, or for any violation of law by the contractors. The principle, therefore, established in several late cases in the Court of Appeals, by which the city is made liable for acts done under a license issued by it, is not applicable. Landau v. City of New York, 180 N. Y. 48, 72 N. E. 631, 105 Am. St. Rep. 709; Spier v. City of Brooklyn, 139 N. Y. 6, 34 N. E. 727, 21 L. R. A. 641, 36 Am. St. Rep. 664. The work, in the doing of which this explosive was used, was a work under the control of the board of commissioners appointed by the Legislature. After providing for the appointment of a board of commissioners, the Legislature had authorized that board to make a contract for the construction of a subway under the streets in the city of New York, and had vested that board with the supervision and management of the work. The city, as a municipal corporation, had no power to interfere in any way either with the board in the making of the contract, or with its contractors in the completion of the work. Thus, the contractor engaged in this work not being under its control, or subject to its supervision, the city could not regulate the amount of explosives that he should keep on hand, or prevent him from carrying out his contract in the way that was prescribed by the rapid transit commissioners. Under the provisions of section 34 of the rapid transit act (chapter 4, p. 18, of the Laws of 1891, as amended by chapter 729, p. 719, of the Laws of 1896) it is expressly made the duty of the board to enter into a contract with any person, firm, or corporation which, in the opinion of the board, shall be best qualified to fulfill and carry out said contract for the construction of said road, and in accordance with the plans and specifications. The road was thus to be constructed by officers appointed by direction of the Legislature, and for any violation of those engaged in its construction the city was not responsible. Haefelin v. McDonald, 96 App. Div. 213, 89 N. Y. Supp. 395. The contractors, thus proceeding under the authority conferred upon them by a contract made with this board under the authority of the Legislature, constructed a magazine for storing explosives as a part of the work done under this contract. They neither asked for nor obtained from the municipal authorities any license to occupy the streets for the work, or for the erection of the necessary magazine for the storage of explosives; nor was the municipal corporation in any way a party or responsible for the acts of the contractor in the performance of the contract. The contractor brought to the work such explosives as he considered necessary for the proper performance of this work. The use of such explosives was expressly required by the contract, over which the city had no control.

What, then, could the city have done, had it known that the contractor was storing explosives in this magazine in excess of that allowed by the regulations of the fire commissioner? The city was not charged with the administration of the criminal law or for the enforcement of the regulations of the fire commissioner, assuming that they had any relation to this work. If the regulations of the fire commissioner were violated, it was the duty of that officer or his subordinate to enforce them, and for their negligence the city was not liable. Statutes imposing a duty in relation to scaffolds, machinery, and the like, or municipal ordinances regulating the use of the streets by third persons, are admissible in evidence upon the question of the negligence of a third person violating such ordinances; but it is clearly established that the municipal corporation is not liable, either for failing to pass an ordinance, or for a violation of an ordinance so passed. Upon no principle, therefore, could these regulations of the fire commissioner be relevant in determining whether or not the city of New York was negligent in refusing to remove this magazine, or liable for its use in the street.

It is claimed, however, that the maintenance of this magazine was a nuisance, and the city became liable for allowing it to remain in the street; and this would appear to be the ruling of the court in the charge to the jury. They were instructed that:

"They must find, in order to entitle this plaintiff to a verdict, that the city of New York and its officers knew of the maintenance of an unlawful and excessive amount of explosives at this point, or that that condition had existed for such a length of time that, in the exercise of reasonable diligence on the part of the officials of New York charged with caring for its street property and looking out for the safety of its streets, they had had an opportunity of ascertaining this condition and remedying it, and, in the exercise of reasonable diligence, a reasonable time so to do."

The court also charged, at the request of the plaintiff, that:

"There is evidence that the regulations of the fire commissioner forbade the storage of more than 60 pounds of blasting powder or 30 pounds of high explosives dynamite in any hand magazine not less than 18 yards from a protected structure of the first class, which would include the Murray Hill Hotel; and the storage of dynamite in violation thereof, if such violation occurred, was unlawful."

To which the defendant excepted. As I understand this instruction, the jury were told that the storage of 30 pounds of dynamite was unlawful, and if the jury found that more than 30 pounds were stored there for such length of time, in the exercise of reasonable diligence, the officers of the city should have discovered it and had it removed, then the city is liable.

Passing the objections of counsel for the city that there was no proof that there was any regulation of the fire commissioner as to the amount of dynamite that it was legal to have on hand in the prosecution of a work of this character, I do not think it clear the fire commissioner has power to limit the amount of dynamite that this contractor could have on hand at any one time. In July, 1902, the charter of 1901 was in force (chapter 466, p. 1, of the Laws of 1901). By section 3, c. 466, p. 3, of the Laws of 1901, section 763 of the charter of 1897 was

continued in force until the board of aldermen should pass ordinances regulating the matters provided for in that section. Section 763 of the charter of 1897 provides that:

"No person shall manufacture, have, keep, sell or give away any gunpowder, * * * or any explosive oils or compounds within the corporate limits of the city of New York, except in the quantities limited, in the manner and upon the conditions herein provided, and under such regulations as the fire commissioner shall prescribe."

It would seem that this prohibition applied only to the quantities limited by the section, and that the regulation of the fire commissioner was to apply only to the quantities prohibited by the section. The section, then, regulates the amount of high explosives which a person licensed to sell them at retail was allowed to keep on hand. The section also contained regulations for the transportations of such explosives. There is no express limitation as to the amount of dynamite that a person constantly using it in the prosecution of his work is to keep on hand, and, as I read this section, no authority is given to the fire commissioner to limit such amount. The power given to the fire commissioner is to make regulations for keeping the quantity of explosives as regulated by the section. After regulating the amount that a person may keep for sale the section provides:

"No nitro-glycerine, dualin or gunpowder shall be manufactured in said city, and no quantities of nitro-glycerine, dualin or gunpowder greater than above provided shall be kept, carried or conveyed within said city; except that for the purposes of distribution to or delivery from stores and buildings in said city a quantity not more than five quarter casts may be carried at any one time, during the daytime for the purpose of transportation from any vessel."

There is no evidence to show that this provision was violated. I cannot find that transporting this dynamite to this magazine, or keeping it there until used under the condition disclosed by the evidence was unlawful, or prohibited by this section, and it would follow that the charge of the trial court to which attention has been called was error and requires a reversal of the judgment.

But, assuming that the contractor was prohibited from keeping more than 30 pounds of dynamite in this magazine, the further question is whether the city of New York is liable for an accident caused by a violation of such prohibition. This dynamite was in use in constructing an underground railway in the city under the authority of a contract made under legislative direction. Subdivision 5 of section 24 of the rapid transit act (chapter 4, p. 15, of the Laws of 1891, as amended by chapter 556, p. 1087, of the Laws of 1892) authorized the contractor to enter upon the several streets to construct the railroad, and the use of the streets was declared a public use for which the streets and avenues are publicly held. Under this provision the contractor, under the direction of the rapid transit commissioners, entered upon Park avenue, under which the railroad was constructed. He erected there a magazine to which dynamite was delivered each day in such amounts as he required. What right had the city authorities to interfere with the contractors in the prosecution of this work? If the construction of the magazine in the public street was authorized,

as I think it was, the city could not have removed it. Certainly the city was not required to station a man at the magazine to see that the contractor did not bring a greater amount of dynamite there than the law allowed, and, if he did, all that the city officers could do was what every other citizen could do—institute proceedings against the contractor, so that the penalties that the law provided for its violation could be imposed.

What seems to me as an answer to the plaintiff's claim to hold the city liable for this explosion is that, so far as this avenue was concerned, the Legislature had directed that it be used for the construction of the railroad, and the city was not liable because such use made the avenue unsafe. The use of Park avenue under legislative authority was rightful. With this the city could not interfere. The use of explosives by the contractor was necessary for the completion of the work. The city was no more liable for an explosion than if the dynamite had been stored on adjoining property. In Bates v. Holbrook, 67 App. Div. 25, 73 N. Y. Supp. 417, on appeal 171 N. Y. 460, 64 N. E. 181, it was conceded that the use of the avenue and streets in which the railroad was being constructed imposed no liability, except where negligence was established, and it was the party guilty of such negligence that would be liable. We may assume that the jury would be justified in finding the contractor guilty of negligence, or that he was maintaining a nuisance; but for his acts he, and not the city, is liable, and, as he was authorized by the Legislature to use the street for the construction of the railroad, a negligent or unauthorized use of such a street imposed no liability upon the city.

The judgment and order appealed from should be reversed, and a new trial ordered, with costs to the appellant to abide the event.

LAUGHLIN, J., concurs. PATTERSON and HOUGHTON, JJ., dissent.

SCOTT, J. (concurring). The obligation resting upon a municipality respecting its streets is that they shall be kept in a reasonably safe condition for use by the public. This obligation depends upon the fact of the use or the invitation to use the highway as such, so that it exists with regard to a street apparently laid out as such and commonly used, although in fact never acquired for or legally appropriated to street uses, and would not exist respecting a strip of land which, although acquired for and in law appropriated to use as a street, had never been actually opened or graded, and presented to the eye none of the characteristics which usually indicate the existence of a street or highway. It is also essential that the municipality shall be lawfully vested with the power to do those things which are necessary to be done in order to secure and preserve the safety of the highway. It follows that if, in a given case, by the paramount authority of the Legislature a portion of a street or highway has been permanently or temporarily diverted from its public use as a street or highway, and appropriated to another public use, which necessarily involves such an interruption or obstruction as will prevent its use for street purposes,

and the municipality is given no power or authority to prevent or regulate its altered use under legislative authority, the obligation of the municipality to keep this portion of the highway reasonably safe for travelers is suspended so long as it remains appropriated to such altered use. For all practical intents and purposes, so far as concerns the municipality, the portion of the street thus diverted from use for highway purposes stands upon the same footing as if it were private property abutting upon the highway.

This is precisely the situation disclosed by the record in the present case. The portion of Park avenue upon which the dynamite magazine was erected had, under the provisions of the rapid transit act, been temporarily diverted from use as a highway, and the city had been left with no power to prevent such diversion and no authority over the part of the street so diverted. The sole authority left to it, and the sole obligation resting upon it, was to keep in a reasonably safe condition so much of the avenue as remained appropriated to highway purposes, and this was effected by the erection of the fence separating the traveled highway from that portion thereof appropriated to other uses. But for the rapid transit act, the erection of a shed or magazine for dynamite, or anything else, in the public highway, would have been an unlawful obstruction, which the city was bound to remove. Under the act the city was powerless, and was obliged to permit this portion of its highway to be diverted to other purposes inconsistent with its use as a highway. If the dynamite magazine had been erected and maintained upon private property abutting upon the highway, it is clear that the city would not have been liable for permitting the contractor to store any given quantity of dynamite; for it can be held liable neither for failure to pass an ordinance forbidding such storage, nor for failure to enforce such an ordinance, if passed. Under the peculiar condition of affairs created by the rapid transit act I am of opinion that the city incurred no greater obligation respecting this dynamite magazine, merely because it was located upon land acquired and held for street purposes, but which by superior authority had been diverted from such use and appropriated to another and inconsistent use, than it would have incurred if the magazine had been erected upon private property abutting upon the street.

LAUGHLIN, J., concurs.